***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments of the parties. *Page 2 
The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties and their representatives. Accordingly, the Full Commission affirms with modifications the Opinion and Award of Deputy Commissioner Gheen.
 ***********
The following were entered into the record as:
 EXHIBITS 1. Stipulated Exhibit #1 — Medical Records.
 2. Stipulated Exhibit #2 — Industrial Commission Forms and Orders.
 3. Deposition of Puneet Aggarwal, M.D.
 4. Deposition of Brian DeLay, M.D.
 5. First Deposition of Stephen Hipp, M.D.
 6. Second Deposition of Stephen Hipp, M.D.
 7. Deposition of Lynn Key, Adjuster.
 8. Deposition of Daniel Murray, M.D.
 9. Deposition of Alan Ward, M.D.
 10. Deposition of Pamela Reddeck, R.N.
 11. Deposition of Sonya Rismiller, M.D.
 12. Deposition of Andrea Schwebel, PhD.
 13. Deposition of Louise Stewart, R.N.
 14. Deposition of Dean Volk, P.T.
 15. Deposition of John Welshofer, M.D.
 16. Deposition of Amanda Zopp, M.D.
 *********** *Page 3 
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At all relevant times the parties were subject to and bound by the provisions of the Workers' Compensation Act (hereinafter "Act").
2. At all relevant times an employer-employee relationship existed between the Plaintiff, and Defendant-Employer.
3. At all relevant times Defendant-Employer was insured for injuries sustained under the Act by W.R. Berkley Corporation and its subsidiaries Key Risk Insurance Company and AIMCO Mutual Insurance Company. The claim was administered by W.R. Berkley subsidiary Key Risk Management Services.
4. The parties entered into a post hearing stipulation after the hearing before the Deputy Commissioner regarding Plaintiff's need for psychological and psychiatric treatment as follows:
 The parties stipulate that Plaintiff's need for psychological and psychiatric treatment is related to the physical symptoms he is experiencing. Defendants agree to provide said treatment and will do so in accordance with the Act unless the Industrial Commission determines that Plaintiff's physical symptoms are not related to the injury of January 20, 2004, or until further order of the Commission.
 ***********
Based upon all of the competent credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT *Page 4 
1. Plaintiff is 65 years-old. His employment history is that of a general and remodeling contractor, performing physical labor all of his adult life. Plaintiff began working for Defendant on June 23, 2003.
2. Defendant was the owner of several companies, including Medical Center Pharmacy. Defendant hired plaintiff to dig ditches, landscape, operate heavy equipment, renovate and upfit various properties, including commercial properties, and shore up roofs while floors were being ripped out underneath. He was paid an annual salary of $30,000.00 and provided rent-free housing owned by Defendant, with a rental value of $750.00 per month. Plaintiff resided in the rent-free housing provided by Defendant beginning from the date of his employment with Defendant in June 2003 until the end of the year in 2003. After Plaintiff moved out from the housing provided by Defendant, Plaintiff's salary increased by $300 per pay period.
3. Medical Center Pharmacy's operations included, in part, delivery of medications and durable medical equipment. Plaintiff worked among all of Defendant's businesses as assigned.
4. On January 20, 2004, Plaintiff was working for Medical Center Pharmacy helping deliver a lift chair/recliner weighing between one hundred and fifty and two hundred pounds. Plaintiff was on the bottom, as he helped the regular delivery person take the chair up a staircase into a private residence. The co-worker's grip slipped and the chair fell back against Plaintiff, pushing his legs into a chair rail, twisting his torso and pushing his shoulders into the wall. Plaintiff experienced an immediate onset of pain up his back and into his neck.
5. After two days of discomfort, Plaintiff sought treatment at the emergency room at Northeast Medical Center in Concord. He recalls feeling pain in his shoulders, neck and lower *Page 5 
back. The emergency room physician, Dr. Amanda Zopp, noted only lumbar pain and no numbness in the lower extremities. Dr. Zopp did not order x-rays or other diagnostic tests.
6. Plaintiff returned to work the following Monday and focused on completing lighter duty tasks for several days, such as changing air conditioner filters at all of Defendant's properties.
7. Plaintiff returned to the heavy tasks required for his job. He developed sensations of tingling in his hands and fingers and heaviness in his legs that he described as having bags of water on his legs. He returned to the emergency room on December 6, 2004 reporting these symptoms and occasionally dropping items unexpectedly. Plaintiff was referred to an orthopaedist.
8. A Form 19 was filed by Defendants on December 8, 2004 stating injury to the "lower lumbar back." Plaintiff filed a Form 18 on December 14, 2004 claiming injuries to the "back-neck-shoulders." Defendant's adjuster noted a conversation with Plaintiff on December 17, 2004 in which he reported pain after the incident to his "back, neck and shoulders." On December 20, 2004, Defendants accepted the Plaintiff's claim by filing a Form 60 that specified a twisting injury to the back. During a Motion hearing before Deputy Commissioner George Glenn on March 25, 2008, Defendants clarified that the Form 60 was intended to admit compensability to Plaintiff's "back" as opposed to "lower back." On the Form 60, Defendants listed plaintiff's average weekly wage as $761.60 with a compensation rate of $507.76.
9. Plaintiff sought treatment with Dr. James Loftus, Jr., an orthopedic surgeon at Northeast Orthopedics in Concord. Defendants paid for treatment by Dr. Loftus, who ordered x-rays, MRIs and a nerve conduction study. Dr. Loftus diagnosed possible cervical spinal stenosis, degenerative disc disease and rotator cuff tendonitis bilaterally. Dr. Loftus determined that *Page 6 
Plaintiff needed surgery to repair his right rotator cuff and bilateral surgeries to correct Plaintiff's carpal tunnel syndrome. A referral was made to Dr. Michael Getter to rule out the possibility of a surgical lesion of the spine. Dr. Getter interpreted the diagnostics as indicating myelomalacia of the spine requiring surgical correction. Dr. Getter recommended deferring spinal surgery until the shoulder and carpal tunnel problems were treated.
10. Dr. Loftus performed the right rotator cuff surgery and right carpal tunnel surgery on May 11, 2005. The left carpal tunnel release was performed on September 14, 2005. Defendants authorized these surgeries. By November, 2005, Plaintiff was found at maximum medical improvement for these conditions and assigned zero ratings for the hands and five percent of the right arm.
11. On January 9, 2006, Dr. Loftus noted Plaintiff displaying signs of depression and he recommended a psychological consult. Dr. Loftus related Plaintiff's depression to his being incapable of work. Defendants' adjuster and rehabilitation nurse did not arrange or assist Plaintiff in obtaining the recommended evaluation.
12. Due to continuing complaints of shoulder pain, Defendants' rehabilitation nurse obtained authorization for Plaintiff to have a second opinion with orthopedic surgeon, Dr. Brian DeLay. Dr. DeLay opined that the right shoulder surgery performed by Dr. Loftus had failed. Dr. DeLay noted the necessity for a second rotator cuff surgery for the right shoulder and projected that the left shoulder would likely need rotator cuff repair as well.
13. Plaintiff underwent an independent medical evaluation with Dr. Alan Ward on March 22, 2006 for continuing complaints involving the upper extremities. The majority of Plaintiff's symptoms were related to the cervical spine, and Dr. Ward saw no evidence of residual carpal tunnel syndrome but noted findings consistent with ulnar neuropathy localized to *Page 7 
the cubital tunnel and right trigger thumb. Dr. Ward did not believe that the cubital tunnel or right trigger thumb symptoms were related to Plaintiff's injury.
14. Dr. Rissmiller requested repeat EMG and nerve conduction studies to rule out ulnar neuropathy versus radiculopathy on December 11, 2007. The EMG/nerve conduction studies were performed by Dr. Puneet Aggarwal on January 10, 2008 and March 11, 2008. Dr. Aggarwal concluded that Plaintiff has polyneuropathy involving the upper and lower extremities.
15. Dr. DeLay recommended resolution of the Plaintiff's spine problems first to ensure that nothing in the spine was contributing to the shoulder problems. Defendants authorized another evaluation by Dr. Dan Murrey, a spine specialist at OrthoCarolina in Charlotte. After extensive diagnostic testing Dr. Murrey in consultation with Dr. Dan Uri, a radiologist, determined that the myelomalacia previously noted by Dr. Getter was likely the result of an arachnoid cyst.
16. Surgery to remove the arachnoid cyst was authorized by the Defendants. Dr. Murrey solicited neurosurgeon Dr. Stephen Hipp to collaborate on the surgery to remove the arachnoid cyst, which compressed the spinal cord at approximately C-6 to T-1. The surgery was performed on August 16, 2006. The operating note describes the underlying spinal cord as having the appearance of a "thumbprint" on it once the cyst was removed
17. The operation successfully removed the cyst, but left a large scar on Plaintiff's back, approximately four inches long and a half-inch wide.
18. Plaintiff continues to have excruciating pain in his shoulder muscles that is treated with a TENS unit. He continues to experience weakness, numbness and tingling in his legs and in both hands. *Page 8 
19. Plaintiff continued treatment with a physical medicine specialist, Dr. Sonya G. Rissmiller, at Carolinas Rehabilitation in Charlotte, as well as psychological therapy from psychologist Andrea Schwebel and psychiatric treatment with Dr. Nelly Welsch pursuant to the stipulation of the parties.
20. The question of whether plaintiff's spinal arachnoid cyst and resulting myelomalacia are related to the injury at work was posed to many of the medical experts in this case. Each deferred to a neurosurgeon or to Dr. Hipp due to the rarity of the condition and their lack of experience with the condition.
21. At his initial deposition on November 19, 2008 Dr. Hipp did not believe that the development of Plaintiff's arachnoid cyst was caused by the compensable injury. Arachnoid cysts in the spine are "developmental," growing "very slowly." When trauma is the cause of an arachnoid cyst, it usually is as a result of tearing of the covering of the spinal cord called the dura. The trauma usually has a very intense inflammatory reaction around the cyst, and plaintiff's cyst did not appear to Dr. Hipp to be a traumatic cyst.
22. At a second deposition on June 2, 2009, Dr. Hipp changed his opinion with respect to the aggravation of plaintiff's previously asymptomatic cyst. Dr. Hipp opined that the blow to plaintiff's back materially aggravated a preexisting but asymptomatic arachnoid cyst, causing it to become symptomatic.
23. Defendants' contention that Dr. Hipp's opinion that plaintiff's work related injury aggravated the asymptomatic arachnoid cyst rests solely on a temporal relationship between plaintiff's injury and the development of symptoms is not well taken. Both Dr. Hipp, at his first deposition, and Dr. Murrey testified that when the spinal cord is already compressed by an arachnoid cyst it is more susceptible to additional trauma. Dr. Hipp specifically reexamined the *Page 9 
Plaintiff following his first deposition. As he had previously been called in only as a consultant in an urgent medical situation, he had primarily relied upon Dr. Murrey's rendition of the medical history. Having taken a complete medical history following the first deposition, he changed his opinion.
24. Dr. Scott Ellison, M.D., who performed a surgical precertification review at the request of the Defendants, also reached the conclusion of a causal relationship, which led Defendants to approve the arachnoid cyst surgery.
25. The greater weight of the conflicting evidence compels a finding that the compensable injury caused a preexisting arachnoid cyst to become symptomatic to the point of requiring surgery.
26. All of Plaintiff's treatment for his shoulders and bilateral carpal tunnel syndrome with Dr. Loftus and Dr. DeLay was authorized and paid for by Defendants' adjuster, Elaine Reavis. When Lynn Key assumed adjusting the claim on behalf of the Defendants, medical compensation for the shoulders and wrists was then denied.
27. Dr. Hipp's credible and convincing testimony establishes that the arachnoid cyst would not affect the nerves that enervate the shoulders. Therefore, Defendants correctly assert that the arachnoid cyst did not neurologically cause Plaintiff's shoulder condition. However, Dr. Hipp, as well as shoulder surgeon Dr. DeLay, opined that Plaintiff's shoulder pain was principally caused by the trauma to the upper back from cutting through the spinal muscles during the arachnoid cyst surgery. The large scar from the arachnoid cyst surgery continues to cause severe pain in Plaintiff's neck and shoulders.
28. The greater weight of the evidence indicates that the bilateral shoulder condition was caused as a consequence of the arachnoid cyst surgery. *Page 10 
29. Plaintiff was diagnosed with bilateral ulnar neuropathies by orthopedic surgeon Dr. Alan Ward. Dr. Ward testified, consistent with the testimony of Dr. Murrey, that the compression of the spinal cord by the arachnoid cyst rendered all nerves "downstream" from that compression more susceptible to injury. In his opinion, the compensable injury was the cause of the bilateral ulnar neuropathies. The convincing weight of the medical evidence compels a finding that Plaintiff's bilateral ulnar neuropathies were caused by the compensable injury.
30. Dr. Ward testified that Plaintiff's right trigger thumb was not related to the compensable injury. Dr. Loftus, the surgeon who performed the right carpal tunnel release, opines that the right trigger thumb was a residual symptom from that surgery. Dr. Loftus' testimony is more convincing as he performed Plaintiff's surgery and has greater familiarity with Plaintiff's condition. The greater weight of the evidence establishes that the right trigger thumb is a natural result of the compensable carpal tunnel surgery and is therefore part of the compensable claim.
31. Plaintiff's self-image as the provider for his family and the constant pain he suffers contribute substantially to his depression. Dr. Schwebel opines that Plaintiff's depression results from his chronic pain and diminished quality of life.
32. The greater weight of the evidence shows that Plaintiff has been disabled from work due to this injury from December 6, 2004 and continuing. Plaintiff has not reached maximum medical improvement for all of his conditions.
33. Defendants Form 60 filed December 20, 2004 reports an average weekly wage of $761.60 and a compensation rate of $507.76. Defendants paid weekly disability benefits at the stated compensation rate until Defendants changed adjusters. *Page 11 
34. On August 8, 2006, Defendants filed a Form 62 notifying the Industrial Commission of a reduction in the average weekly wage to $561.96 and the compensation rate to $374.66.
35. On March 23, 2007, a second Form 62 was filed raising the average weekly wage to $694.40 and the compensation rate to $462.96.
36. As Plaintiff worked for Defendant for a period of less than 52 weeks prior to his injury, the Full Commission finds that the third method of determining Plaintiff's average weekly wage under N.C. Gen. Stat. § 97-2(5) is the most fair and just. Under the third method, the average weekly wage is determined by dividing the earnings during the period of employment prior to the injury by the number of weeks and parts thereof during which the employee earned wages. Prior to Plaintiff's injury, Plaintiff worked 30.29 weeks during which time he earned $17,090.77 in actual wages and $4,700.00 as a housing allowance totaling $21,790.77 in wages. Under method three this results in an average weekly wage of $719.40 resulting in a weekly compensation rate of $479.62.
37. Defendants present the issue of whether the Order of May 10, 2007 granting Plaintiff's motion to authorize medical rehabilitation is erroneous. This motion was filed by Defendants to have Marion Morrow, a rehabilitation nurse, removed. Ms. Morrow has retired since the Motion and has been replaced by Jane Doggett, RN. As Ms. Doggett is Defendants' choice, this issue is now moot.
38. Plaintiff and Defendants filed cross claims for attorney fees for unfounded and stubborn litigation. This workers' compensation action presents numerous factual issues and the application of law to those facts make an award of attorney fees inappropriate for either party.
 *********** *Page 12 
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury on January 20, 2004. N.C. Gen. Stat. § 97-2(6). Defendants filed a Form 60 on December 20, 2004 admitting compensability for a twisting injury to the back. In the instant case, Defendants stipulated in a hearing before the Deputy Commissioner that the Form 60 accepted compensability as to Plaintiff's "back" as opposed to the "lower back." The Act uses the term "back" as a term of art, N.C. Gen. Stat. §§ 97-2(6), 97-31 97-40.1, which the Full Commission has further defined to include the cervical, thoracic and lumbar spine. NCIC Rating Guide.
2. Through Defendants' admission and based upon the greater weight of the evidence, Plaintiff's bilateral carpel tunnel is related to the injury by accident. N.C. Gen. Stat. § 97-25.
3. The aggravation of an injury is compensable if the primary injury arose out of and in the course of employment, and the subsequent aggravation of that injury is a natural consequence that flows from the primary injury. Horne v. Univ. Leaf TobaccoProcessors,119 N.C. App. 682, 685, 459 S.E.2d 797, 799, disc. reviewdenied, 342 N.C. 192, 463 S.E.2d 237 (1995). The greater weight of the evidence establishes that Plaintiff's compensable body parts and conditions include the cervical, thoracic and lumbar spine, bilateral shoulders, bilateral carpal tunnel, bilateral ulnar neuropathies, right trigger thumb and depression, which are directly related to the original compensable injury by accident. Id.
4. Defendants' contention that Dr. Hipp's opinion as to aggravation of the preexisting arachnoid cyst is mere speculation in contravention of the fallacy of "post hoc, ergo *Page 13 poropter hoc" is misplaced. In Young v. Hickory BusinessFurniture, 353 N.C. 227, 538 S.E.2d 912 (2000), the State Supreme Court held that expert medical testimony was mere speculation where the expert's opinion was based only on the temporal relationship between the injury and symptoms of a disease process that has no known tests to determine its existence where other potential causes existed and the medical care provider had not conducted tests that would have ruled out the other known possible causes. Dr. Hipp's opinion, supported by the testimony of Dr. Murrey, is compelling and establishes an injury by accident aggravating a preexisting condition which is compensable under the Act. Gregory v. W. A. Brown Sons,187 N.C. app. 580, 654 S.E2d 254 (2007), writ denied, reviewdenied, 262, N.C. 233, 659 S.E.2d 435 (2008).
5. Plaintiff has proven by the greater weight of the evidence that his right trigger thumb is related to the consequences of his injury by accident. N.C. Gen. Stat. § 97-2(6).
6. Dr. Hipp and Dr. DeLay's expert testimony establishes by the greater weight of the evidence that Plaintiff's shoulder pain is related to the trauma of the Plaintiff's back surgery and is, therefore, a consequence of his injury by accident. N.C. Gen. Stat. § 97-2(6).
7. The greater weight of the credible evidence shows that Defendants were not in violation of N.C. Gen. Stat. §§ 97-18(b), 97-82(b) when Defendants modified Plaintiff's average weekly wage by filing the appropriate Form 62 on August 8, 2006 and on March 23, 2007.
8. The greater weight of the credible evidence shows that Plaintiff has been disabled since December 6, 2004.Russell v. Lowes Product Distrib.,108 N.C. App. 762, 425 S.E.2d 454 (1993).
9. As Plaintiff worked for Defendant for a period of less than 52 weeks prior to his injury, the Full Commission finds that the third method of determining Plaintiff's average weekly wage under N.C. Gen. Stat. § 97-2(5) is the most fair and just. Under the third method, *Page 14 
the average weekly wage is determined by dividing the earnings during the period of employment prior to the injury by the number of weeks and parts thereof during which the employee earned wages. Prior to Plaintiff's injury, Plaintiff worked 30.29 weeks during which time he earned $21,790.77 in wages. Under method three this results in an average weekly wage of $719.40 resulting in a weekly compensation rate of $479.62. N.C. Gen. Stat. § 97-2(5)
10. This workers' compensation action involved numerous factual and legal issues and the litigation is not stubborn or unfounded. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay medical compensation in accordance with Industrial Commission procedures for diagnostics, evaluation, and treatment rendered for Plaintiff's cervical, thoracic and lumbar spine, bilateral shoulders, bilateral carpal tunnel, bilateral ulnar neuropathies, right trigger thumb, and depression as may reasonably be required to effect a cure, give relief or lessen the period of Plaintiff's disability.
2. Defendants shall continue to pay Plaintiff temporary total disability payments until further order of the Industrial Commission at the rate of $479.62 per week.
3. Defendants shall pay a reasonable attorney fee of twenty-five percent of all disability payments to Plaintiff's Counsel.
4. Defendants shall pay the costs due this Commission.
This the 12th day of November 2010. *Page 15 
 S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/_____________ DANNY LEE McDONALD COMMISSIONER
 S/_____________ LINDA CHEATHAM COMMISSIONER *Page 1